# FOR PUBLICATION



FILED
Dec 17 2014, 10:03 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**GARY L. GRINER**
Mishawaka, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**GEORGE P. SHERMAN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| TYRONE WINKLEMAN, | ) | |
| | ) | |
| Appellant/Defendant, | ) | |
| | ) | |
| vs. | ) | No. 20A03-1405-CR-157 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee/Plaintiff. | ) | |

APPEAL FROM THE ELKHART CIRCUIT COURT
The Honorable Terry C. Shewmaker, Judge
Cause No. 20C01-1307-FA-00040

**December 17, 2014**

**OPINION – FOR PUBLICATION**

**VAIDIK, Chief Judge**

**Case Summary**

Tyrone Winkleman was convicted of Class A felony robbery resulting in serious bodily injury, Class A felony kidnapping, and Class B felony criminal confinement, and sentenced to seventy-six years for kidnapping a truck driver in Elkhart, Indiana. Winkleman now appeals, arguing that the trial court committed fundamental error in instructing the jury because it omitted an element from the kidnapping instruction, failed to advise him of his *Boykin* rights before he pled guilty to the habitual-offender allegation, and abused its discretion in identifying four of the aggravators when sentencing him. Concluding that the jury instruction does not constitute fundamental error, Winkleman has failed to establish on this record that he did not know he was waiving his *Boykin* rights, and the trial court did not abuse its discretion in identifying the aggravators, we affirm the trial court.

**Facts and Procedural History**

James Armagost is an independent contractor who delivers travel trailers around the country using his own Ford F-350 truck to haul them. On July 24, 2013, sixty-eight-year-old James drove to Elkhart, Indiana, from Virginia. He was going to pick up a trailer from Indiana Transport the next morning and drive it to Tallahassee, Florida. Indiana Transport paid James half of his money up front and put that amount on a "Comdata"[1] card so that James could pay for his fuel and other travel expenses. Tr. p. 131. James got a room at

---

[1] Comdata is a company that delivers fleet-payment solutions. Drivers can receive their payroll funds, cash advances, per diem, and more all on one card. Comdata, *How It Works*, http://www.comdata.com/fleet-solutions/comdata-fleet-card/index (last visited Dec. 4, 2014).

2

the Budget Inn in Elkhart so that he could get a good night's sleep before leaving for Florida in the morning.

As James carried his luggage to Room 121, he noticed a man, later identified as thirty-three-year-old Winkleman, sitting in a chair outside Room 120 and said "hi" to him. *Id.* at 135. After James unpacked his belongings, he left for dinner. When James returned from dinner, Winkleman approached him in the motel parking lot. Winkleman was "shuffling" and appeared to be having "a hard time breathing." *Id.* at 137. Winkleman asked James for help, and James offered to call 911. But when James reached out to support Winkleman, Winkleman struck James hard in the face, lifting James off his feet and onto the ground and causing him to bleed. Winkleman then displayed a knife and told James that if he screamed, he would cut off his head. *Id.* at 139. Winkleman held James down by putting one shoe across his upper chest; he then choked James with his left hand while holding the knife in his right hand. According to James, he "couldn't breath[e] at all." *Id.* James eventually asked Winkleman what he wanted, and Winkleman replied, "I want your wallet, and I want it now." *Id.* at 140-41. James handed over his wallet. Winkleman then asked for James's guns. When James explained that he did not travel with guns, Winkleman did not believe him, reasoning, "[Y]ou're a cowboy. I know damn well you got guns in [your truck]." *Id.* at 141. After Winkleman realized that he had all of James's cash, he demanded James's Comdata card. James gave Winkleman his Comdata card as well as his other credit cards.

Winkleman then "yanked" James up and dragged him to his motel room. *Id.* at 142. Once inside, Winkleman started "talking trash" and threatening James. *Id.* Winkleman

3

tore up a towel and indicated that he was going to tie up James with it. At this point, James told Winkleman that he had heart problems and that he needed his nitroglycerin medication, which he kept in a cylinder bottle attached to his keychain; however, Winkleman had his keys. Winkleman gave James a couple of pills from the bottle. Winkleman then continued his threats and told James that he would cut his throat if he did not cooperate. Winkleman explained that he needed a lot of money "fast" because he wanted to bail his girlfriend out of jail that night. *Id.* at 144. Winkleman put on some of James's clothes, gave James some towels to cover his bleeding, and helped James into the passenger side of James's truck. *See id.* at 146 ("Q: Do you think at that point you could have run? A: I think at that point without help I couldn't have walked.").

Winkleman drove James's truck to Yoder's Truck Stop and used James's Comdata card to make two withdrawals of $300 from an ATM. Winkleman then drove to a trailer park, where he claimed to be living. Winkleman took James to a shed and ordered him to stay inside. Winkleman told James that he was in the "ville" and that if he tried to escape, his neighbors would catch him. *Id.* at 150. Winkleman eventually returned to the shed with sandwiches and took James back to the truck.

Winkleman then drove to a Marathon gas station and started talking to some females who were loitering outside. One of the females, Casey Kelly, got in the truck. As soon as Casey got in the truck, she saw that James's "face was bloody with a towel to it" and that he was "bleeding all over the place." *Id.* at 258. After stopping at a liquor store, Winkleman and Casey began looking for drugs. They eventually stopped at a house on Middlebury Street to buy cocaine from someone Casey knew. When Winkleman stopped

4

the truck, James tried to escape, but Winkleman yelled at him to stop. Realizing he could not run due to his injuries, James reluctantly got back in the truck.

Winkleman then drove back to the Budget Inn. Winkleman put James in James's motel room, Room 121, and James asked Winkleman if he was going to kill him; Winkleman replied that he did not know yet. Then Winkleman, using James's room key, locked James in the room from the outside and took the key with him to his own room, Room 120, where he took Casey to "[t]o party and have sex." *Id.* at 263. Winkleman, apparently, did not realize that James could simply unlock the door from the inside. So, as soon as James heard "the bed [next door] start[] rumbling," he simply "walked right out of the room" and went to the McDonalds across the street to call the police. *Id.* at 155.

Police officers went to Winkleman's motel room, Room 120, and found him inside with a naked female. The officers found a knife, a room key that said Room 121, and a cell phone on top of the bed, as well as James's Comdata card, credit cards, and truck keys with the medication cylinder attached. The officers also found a large amount of "crisp" cash on a table that looked like it had come from an ATM. *Id.* at 71. An officer read Winkleman his *Miranda* rights, and Winkleman said he was willing to talk to the police. Winkleman had an injury to his hand that he said was from hitting a wall. When the officer asked Winkleman if he hit James, he said yes. *Id.* at 75. At this point, the officer arrested Winkleman. James was treated at the Elkhart General Hospital emergency room for multiple facial fractures, contusions, and lacerations that required stitches.

The State charged Winkleman with Count I: Class A felony robbery resulting in serious bodily injury, Count II: Class A felony kidnapping, Count III: Class B felony

5

criminal confinement, and Count IV: Class B felony carjacking. The State later alleged that Winkleman was a habitual offender. Following a jury trial, Winkleman was convicted as charged. Winkleman pled guilty to the habitual-offender allegation. *Id.* at 212-21. For double-jeopardy purposes, the trial court entered judgment of conviction on Counts I, II, and III only. The trial court identified numerous aggravating circumstances in its written order: the victim was sixty-eight years old; Winkleman's criminal history, which consisted of two juvenile adjudications, several felonies (including robbery, kidnapping, aggravated assault with a deadly weapon, and felon in possession of a firearm), a pending case, and the fact that this case involved "multiple counts"; Winkleman's IRAS score indicated that he was at a high risk of reoffending; Winkleman took the victim's keychain, which contained his heart medication—James had heart problems, and Winkleman withheld medical treatment from him; Winkleman used the proceeds of the robbery to buy drugs and pay for a prostitute; and the offenses in this case were similar to his prior felony offenses, yet his prior sanctions did not rehabilitate him. Appellant's App. p. 73. The court identified the following mitigating circumstances: all statements of Winkleman and his counsel; his mental-health and addiction issues, and the fact that he admitted to the habitual-offender enhancement. The court concluded that "any one of the aggravators taken individually or all of them taken as a whole outweigh the mitigators warranting the imposition of a substantially aggravated sentence for each Count." *Id.* at 74. The trial court sentenced Winkleman to forty-six years for Count I, enhanced by thirty years for being a habitual offender, forty-six years for Count II, and sixteen years for Count III. The

6

court ordered the sentences to be served concurrently, for an aggregate term of seventy-six years.

Winkleman now appeals.

**Discussion and Decision**

Winkleman raises three issues on appeal. First, he contends that the trial court erred in instructing the jury on the elements of kidnapping because the instruction omitted an element. Second, he contends that the trial court failed to advise him of his *Boykin* rights before he pled guilty to the habitual-offender allegation. Last, he contends that the trial court erred in identifying four of the aggravators.

**I. Jury Instruction**

Winkleman contends that the trial court erred in instructing the jury on the elements of kidnapping—Instruction No. 4—because the instruction omitted an element. Because he did not object to this instruction at trial, Winkleman raises this issue under fundamental error. The State agrees that Instruction No. 4 omitted an element but claims that the error is harmless, not fundamental.

Instructing a jury is left to the sound discretion of the trial court, and we review its decision only for an abuse of discretion. *Washington v. State*, 997 N.E.2d 342, 345 (Ind. 2013). To constitute an abuse of discretion, the instruction given must be erroneous, and the instructions viewed as a whole must misstate the law or otherwise mislead the jury. *Brooks v. State*, 895 N.E.2d 130, 132 (Ind. Ct. App. 2008). Fundamental error is an extremely narrow exception to the waiver rule where the defendant faces the heavy burden of showing that the alleged errors are so prejudicial to the defendant's rights as to "make a

7

fair trial impossible." *Ryan v. State*, 9 N.E.3d 663, 668 (Ind. 2014), *reh'g denied*. In evaluating the issue of fundamental error, we must look at the alleged misconduct in the context of all that happened and all relevant information given to the jury—including evidence admitted at trial, closing argument, and jury instructions—to determine whether the misconduct had such an undeniable and substantial effect on the jury's decision that a fair trial was impossible. *Id.*

The kidnapping charging information alleged that Winkleman knowingly—while hijacking a car—removed James by fraud, enticement, force, or threat of force from one place to another. Appellant's App. p. 9 (citing Ind. Code Ann. § 35-42-3-2(b)(2) (West 2012)). Instruction No. 4 then provided:

> The crime of kidnapping is defined by law as follows:
>
> A person who knowingly or intentionally confines another person while hijacking a vehicle commits kidnapping, a Class A Felony.[2]
>
> Before you may convict the Defendant, the State must have proved each of the following beyond a reasonable doubt:
>
> 1. The Defendant
> 2. knowingly
> 3. removed [James Armagost]
> 4. while hijacking a vehicle.
>
> If the State failed to prove each of these elements beyond a reasonable doubt, you must find the Defendant not guilty of Kidnapping, a Class A Felony, as charged in Count II.

---

[2] This is actually the definition of kidnapping pursuant to Indiana Code section 35-42-3-2(a); however, Winkleman was charged pursuant to subsection (b).

Winkleman also mentions in passing that the instruction did not define the term "hijacking," but he does not develop this argument. *See* Ind. Appellate Rule 46(A)(8)(a).

*Id.* at 48. Winkleman argues, and the State agrees, that Instruction No. 4 omitted the element of force or threat of force. *See* I.C. § 35-42-3-2(b)(2) ("A person who knowingly or intentionally removes another person, by fraud, enticement, force, or threat of force, from one place to another: . . . (2) while hijacking a vehicle; commits kidnapping, a Class A felony." (formatting altered)). Winkleman claims that it is bedrock law that a defendant is entitled to have the jury instructed on all elements of the charged offense. *See In re Winship*, 397 U.S. 358, 364 (1970). However, an error in an instruction does not rise to the level of fundamental error where the issue was not a central issue at trial. *See Hall v. State*, 937 N.E.2d 911, 913 (Ind. Ct. App. 2010) (holding that error in an instruction on mens rea does not rise to the level of fundamental error where the defendant's mens rea was not a central issue at trial); *see also Sanders v. State*, 764 N.E.2d 705, 711 (Ind. Ct. App. 2002) (noting that attempted-murder instructions that omit the element of intent to kill do not constitute fundamental error if the defendant's intent to kill was not a central issue at trial and specifically holding: "The existence of the omitted element of intent is so well established in the Record that the trial court's failure to instruct the jury on the specific[-]intent element in the attempted[-]murder instruction is harmless error" and "does not rise to the level of fundamental error because there is no question that [the defendant] intended to kill [the victim]."), *trans. denied*.

Here, the element of force or threat of force was clearly established at trial. James testified at trial that after Winkleman beat and robbed him in the parking lot, Winkleman dragged him to his motel room. Winkleman continued to threaten James in the motel room and then moved James from the motel room to the passenger seat of James's truck. In fact,

9

Winkleman threatened to cut James's throat if he did not cooperate. Tr. p. 144. Because the element of force or threat of force was not a central issue for the kidnapping charge, its omission from Instruction No. 4 does not rise to the level of fundamental error. This is especially so given that Instruction No. 3 quoted the kidnapping charging information, which properly included the element of force or threat of force:

> [O]n or about the 25th day of July, 2013, at the County of Elkhart, State of Indiana, one TYRONE WINKLEMAN, did knowingly, while hijacking a vehicle, remove another person *by fraud, enticement, force or threat of force,* from one place to another, to-wit: [James Armagost]; all of which is contrary to the form of I.C. § 35-43-3-2(b)(2) . . . .

Appellant's App. p. 45 (emphasis added). Winkleman has not established fundamental error in Instruction No. 4.[3]

## II. Habitual Offender

Next, Winkleman contends that the trial court failed to advise him of his *Boykin* rights before he pled guilty to the habitual-offender allegation.[4] According to *Boykin v. Alabama*, 395 U.S. 238, 243 (1969), a trial court must be satisfied that an accused is aware of his right against self-incrimination, his right to trial by jury, and his right to confront his accusers before accepting a guilty plea. *See also* Ind. Code § 35-35-1-2 (noting that the trial court shall not accept a plea of guilty without first determining that the defendant has

---

[3] Winkleman also argues that Instruction No. 16 "misled the jury as to which elements the State did . . . and did not have to prove beyond a reasonable doubt." Appellant's Br. p. 7. Instruction No. 16 provided: "While it is necessary that every essential element of the crime charged against the accused should be proven by the evidence beyond a reasonable doubt, this does not mean that all incidental facts must be proven beyond a reasonable doubt." Appellant's App. p. 61. This instruction did not relieve the State of its burden of proving the element of force or threat of force.

[4] According to Winkleman, he pled guilty to being a habitual offender, as opposed to entering into a stipulation acknowledging that he had been convicted of felonies on certain dates. *See Hopkins v. State*, 889 N.E.2d 314, 317 (Ind. 2008).

10

been informed that he is waiving certain rights). However, *Boykin* does not require that the record of the guilty-plea proceeding show that the accused was formally advised that entry of his guilty plea waives certain constitutional rights, nor does *Boykin* require that the record contain a formal waiver of these rights by the accused. *Dewitt v. State*, 755 N.E.2d 167, 171 (Ind. 2001). Rather, *Boykin* only requires a conviction to be vacated if the defendant did not know or was not advised at the time of his plea that he was waiving his *Boykin* rights. *Id.*

Here, Winkleman admitted to the habitual-offender allegation before trial resumed on the second day. *See* Tr. p. 212. Winkleman argues that the trial court's failure to advise him of his *Boykin* rights before he pled guilty to the habitual-offender allegation requires that his plea be vacated. We disagree. First, when the trial court asked Winkleman if he wanted an advisement of rights, Winkleman said no:

> THE COURT: All right. Now, do you want me to go through a rights advisement as if it was a plea?
> MR. WINKLEMAN: No.
> THE COURT: No. That's not necessary as far as you're concerned[?]
> MR. WINKLEMAN: That's not necessary.
> THE COURT: All right. And you know you can have a jury trial and have a jury determine if you're a habitual criminal offender if you want.
> MR. WINKLEMAN: Yes.
> THE COURT: And it would be the same jury, and they would make a determination in a second part of this trial. Correct?
> MR. WINKLEMAN: Yes.
> THE COURT: And you have your counsel, and it'd just be like a second part of the trial. The state would have to prove to the jury beyond a reasonable doubt that you committed these other felony offenses, and the jury would then render a verdict. You'd have the right to present your side of the story, and the jury would make a determination. Understood?
> MR. WINKLEMAN: Yes.
> THE COURT: And understanding all those rights it's your desire here today to admit being [a] habitual criminal offender, and you understand that will come into play only if you're convicted of the underlying offenses.

11

MR. WINKLEMAN: Yes.

*Id.* at 218-19. The trial court then found that Winkleman was a habitual offender, if, in fact, the jury found that he was guilty of one of the felonies. *Id.* at 219.

Second, Winkleman pled guilty "in the midst of a jury trial, where the *Boykin* rights are on display for all to see." *Hopkins v. State*, 889 N.E.2d 314, 317 (Ind. 2008) (noting that the issue of whether *Boykin* even applies to habitual-offender proceedings is an open question not addressed by the parties on appeal). Accordingly, Winkleman has failed to establish on this record that he did not know he was waiving his *Boykin* rights.

### III. Sentencing

Last, Winkleman contends that the trial court erred in sentencing him. Sentencing decisions rest within the sound discretion of the trial court. *Anglemyer v. State*, 868 N.E.2d 482, 490 (Ind. 2007), *clarified on reh'g*, 875 N.E.2d 218 (Ind. 2007). So long as the sentence is within the statutory range, it is subject to review only for an abuse of discretion. *Id.* An abuse of discretion will be found where the decision is clearly against the logic and effect of the facts and circumstances before the court or the reasonable, probable, and actual deductions to be drawn therefrom. *Id.* A trial court may abuse its discretion in a number of ways, including: (1) failing to enter a sentencing statement at all; (2) entering a sentencing statement that includes aggravating and mitigating factors that are unsupported by the record; (3) entering a sentencing statement that omits reasons that are clearly supported by the record; or (4) entering a sentencing statement that includes reasons that are improper as a matter of law. *Id.* at 490-91. If a trial court abuses its discretion, "remand for resentencing may be the appropriate remedy if we cannot say with confidence that the

trial court would have imposed the same sentence had it properly considered reasons that enjoy support in the record." *Id.*

The trial court identified numerous aggravators, only four of which Winkleman challenges on appeal: (1) James had served in the military, *see* Tr. p. 422, because this crime is not related to James's status as a veteran; (2) Winkleman took James's keychain, which had his heart medication attached to it; (3) this case involved multiple counts, because Winkleman was sentenced on each count; and (4) Winkleman used the proceeds of the robbery to pay for a prostitute, because there was no evidence to support the allegation that Casey was a prostitute.

The trial court concluded, however, that "any one of the aggravators taken individually or all of them taken as a whole outweigh the mitigators warranting the imposition of a substantially aggravated sentence for each Count." Appellant's App. p. 74. Therefore, the record clearly supports that the trial court would have imposed the same sentence without regard to the aggravators that Winkleman now challenges on appeal. *McDonald v. State*, 868 N.E.2d 1111, 1114 (Ind. 2007).

Nevertheless, we briefly address Winkleman's arguments. First, the trial court did not list James's military service as an aggravator in its written order. *See* Appellant's App. p. 72-77. This indicates that his service was not a significant factor in the trial court's sentencing calculus. Second, although Winkleman argues that he gave James his nitroglycerine medication when he asked for it, Winkleman remained in control of James's medicine and failed to seek medical treatment for him. Third, in the context of discussing Winkleman's criminal history, the trial court noted that this case involved "multiple

13

counts." The law is settled that "the fact of multiple crimes is a valid aggravating factor." *McDonald*, 868 N.E.2d at 1114. Finally, Winkleman argues that the trial court erred in finding that he used the proceeds of the robbery to pay for a prostitute because Casey voluntarily had sex with him. However, the trial court also found that Winkleman used the proceeds of the robbery to purchase cocaine, and Winkleman does not challenge this aspect of the aggravator. We therefore affirm Winkleman's seventy-six-year sentence.

Affirmed.

BAKER, J., and RILEY, J., concur.