## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jun 29 2015, 8:40 am

Kevin S. Smith

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Kurt A. Young
Nashville, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Ian McLean
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

James G. Wilson,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

June 29, 2015

Court of Appeals Case No.
49A02-1409-CR-647

Appeal from the Marion Superior Court.
The Honorable Marc Rothenberg, Judge.
Cause No. 49G02-1111-FA-80777

**Darden, Senior Judge**

# Statement of the Case

James G. Wilson shot his wife, Jaime Wilson, in the stomach with a shotgun. He appeals his conviction by jury of attempted murder, a Class A felony.[1] We affirm.

# Issue

James raises one issue, which we restate as: whether the trial court committed fundamental error in instructing the jury.

# Facts and Procedural History

On the night of November 12, 2011, James and Jaime smoked crack cocaine at an apartment in Indianapolis. They argued, and Jaime left to spend the night at James' mother's home. That same night, Jaime's brother, James Cart, tried to call her. James called Cart back, using Jaime's phone. Cart asked James where was Jaime, and James replied that she was with Cart. After Cart explained that Jaime was not with him, James said, "next time I see her I have [a] shotgun and I'm on [sic] blow her up." Tr. p. 189.

The next morning, Jaime went looking for James and found him sitting in his car. James was still angry when Jaime got into the car. As he drove to his

---

[1] Ind. Code §§ 35-41-5-1 (1977), 35-42-1-1 (2007).

father's house, James was "driving crazy" and verbally abused Jaime, calling her "scum, a slut, a crack whore, and everything else." *Id.* at 164.

[5] No one was at James' father's house when they arrived. Jaime attempted to leave, but James retrieved a shotgun, pointed it at her head, and threatened to shoot her in the back of her head if she tried to leave.

[6] Next, James ordered Jaime to go into a bedroom. He ordered her to stand by the wall furthest from the door and aimed the gun at different parts of her body, "like he was looking for the best shot." *Id.* at 168. In a loud voice, James continued to insult Jaime and accused her of stealing $2,000 from him and his father. She begged for her life, pleading with him to put the gun down.

[7] When James stepped into the hallway, Jaime closed the bedroom door on the gun and tried to take it. After a short struggle, James regained control of the gun, and Jaime ended up in the bedroom with the door closed. She opened the door and came out because she "didn't want the gun—the bullets to come through the, the door." *Id.* at 170.

[8] Jaime went to the kitchen and poured a glass of water. As she was standing by the refrigerator, James shot her in the stomach at close range, and she fell to the floor. Jaime told James he had shot her, but he said nothing. She crawled into the living room, leaving a trail of blood on the floor. James approached Jaime, grabbed her by the hair, and forced her to look at him. He then said, "I'm gonna do you and then I'm gonna do me." *Id.* at 175. Jaime understood James

to mean that he intended to kill her and then himself. She begged for her life again, saying that their three children needed her.

[9] Jaime saw the front door open, and the next thing she remembered, she was outside, on the grass. James told her he was sorry and not to look at her wound. Next, he said that she would be alright and that he would go get help.

[10] Meanwhile, a neighbor heard her dogs barking, so she looked outside and saw James and Jaime. Jaime was lying on the ground screaming, so the neighbor called 911.

[11] Officer Paul Humphrey was dispatched to the house. Upon arriving, he saw Jaime lying in the front yard. There was blood on the front of her shirt. She was "terrified." *Id.* at 149. Officer Humphrey asked what happened, and Jaime pointed at the house as she said, "he shot me." *Id.* at 150. She also said his name was James. Officer Humphrey looked at the house and saw James walking through the living room toward the front door, holding the shotgun. Officer Humphrey drew his handgun and told James to drop his weapon. James did not immediately comply until another officer arrived and, with both officers' weapons drawn, they ordered him to put down the gun. The officers took James into custody.

[12] Jaime was taken to the hospital. She had extensive internal as well as external bleeding, and her blood pressure was dangerously low. Doctors performed emergency surgery, opening her abdominal cavity to assess her injuries. The shotgun blast damaged her colon, small intestine, ureter, and muscles and blood

vessels adjacent to her spine. Some of the pellets went almost all of the way through her body, resulting in bruising to the skin on her back. Jaime was in the hospital for thirty-four days, during which time she was subjected to five major surgeries to reconstruct her gastrointestinal tract. She was on a ventilator for twelve days and received artificial nutrition. She would have died if she had not received medical care immediately.

[13] Police collected a shotgun and a spent shell from the house. Subsequent testing revealed that the shotgun had fired the shell. In addition, James' fingerprint was found on the shotgun.

[14] The State charged James with attempted murder. The case was delayed because the trial court deemed James incompetent to assist with his defense and ordered him sent to Logansport State Hospital for treatment. Once James was deemed to be competent, the case resumed, and James requested leave to represent himself at trial. The trial court granted James' request and appointed standby counsel.

[15] At the beginning of the trial, the court submitted proposed preliminary jury instructions to the parties. Neither party objected to any of the instructions. The court read the preliminary instructions to the jury and gave the jurors notebooks that included copies of those instructions.

[16] Later during the trial, outside the presence of the jury, the court raised a question about Preliminary Instruction 5a, which set forth the elements of the offense of attempted murder. The court asked the parties whether they thought

the instruction was erroneous because it included the word "knowingly." *Id.* at 249-50. The court further stated that it would permit a revision to the instruction, if the parties requested it. After further discussion, the State requested a revision to the instruction to remove the word "knowingly." *Id.* at 257. James objected to the State's motion. The court decided not to take further action on the instruction at that time.

[17] After the State rested, the court held a hearing outside of the presence of the jury. During the hearing, the State again asked that the preliminary instruction be revised to remove the word "knowingly." *Id.* at 320. James objected again. The court overruled James' objection.

[18] When the jury returned to the courtroom, the court instructed them to remove their copies of Preliminary Instruction 5a from their notebooks. The bailiff took away those copies and distributed to the jurors a revised version of that instruction that omitted the word "knowingly." *Id.* at 327. Next, the court read the revised instruction to the jury. James testified in his own defense.

[19] The jury determined that James was guilty of attempted murder. The trial court sentenced him per the jury's verdict. This appeal followed.

# Discussion and Decision

[20] James argues that the trial court committed reversible error in presenting the original version of Preliminary Instruction 5a to the jury in the first place. He acknowledges that the court later revised the instruction and gave a corrected,

revised instruction to the jury, but he maintains the court's actions were insufficient to correct the error.

[21]  In general, instructing a jury is left to the sound discretion of the trial court, and we review its decision only for an abuse of discretion. *Winkleman v. State*, 22 N.E.3d 844, 849 (Ind. Ct. App. 2014), *trans. denied*. Here, James concedes that he did not initially object to Preliminary Instruction 5a.[2] To the contrary, he objected only when the State moved to revise it.

[22]  James now argues that the presentation of the original version of Preliminary Instruction 5a to the jury amounted to fundamental error. The doctrine of fundamental error is an extremely narrow exception to the waiver rule. *Id*. Under fundamental error review, a defendant must show that an error was so misleading as to make a fair trial impossible or blatantly violate basic due process. *Knapp v. State*, 9 N.E.3d 1274, 1285 (Ind. 2014), *cert. denied*, 135 S. Ct. 978, 190 L. Ed. 2d 862 (2015). We look at the alleged error in the context of all that happened and all relevant information given to the jury—including evidence submitted at trial, closing argument, and jury instructions—to determine whether the error, if any, had such an undeniable and substantial

---

[2] James states that he has been diagnosed with numerous mental illnesses and claims that he "did not appear to be capable of raising a correct and coherent objection." Appellant's Br. p. 16. He does not claim on appeal that the trial court erred in determining that he was mentally competent to participate in court proceedings, nor does James assert that the trial court erred in allowing him to waive his right to counsel and proceed pro se at trial.

effect on the jury's decision that a fair trial was impossible. *Winkleman*, 22 N.E.3d at 849.

[23] The original version of Preliminary Instruction 5a, as read to the jurors and presented to them in their notebooks, provided as follows:

> The crime of attempted murder is defined as follows:
>
> A person attempts to commit a murder when, acting with the specific intent to kill another person, he engaged in conduct that constitutes a substantial step toward killing that person.
>
> Before you may convict the Defendant of Attempted Murder, the State must have proved each of the following elements beyond a reasonable doubt:
>
> 1.   The Defendant, James Wilson
>
> 2.   Acting with the specific intent to kill Jaime Wilson
>
> 3.   Did knowingly shoot a deadly weapon, that is: a shotgun, at and against the person of Jaime Wilson
>
> 4.   which [sic] was conduct constituting a substantial step toward the commission of the intended crime of killing Jamie Wilson
>
> If the State failed to prove each of these elements beyond a reasonable doubt, you should find the defendant not guilty of the crime of Attempted Murder, a Class A Felony, as charged in Count I.

Appellant's App. p. 142.

[24] The revised instruction omitted the word "knowingly." Tr. p. 327. Wilson argues that the use of the word "knowingly" initially misinformed the jury of the elements of the offense that the State had to prove to obtain a conviction.

[25] However, even if the original instruction misstated the law, we cannot say that the error was so misleading as to make a fair trial impossible or blatantly violate basic due process.[3] The word "knowingly" was used once and was included only in Preliminary Instruction 5a in reference to the element related to the shooting of the shotgun. The original version of Preliminary Instruction 5a also advised the jury twice that the State was required to prove that James had the "specific intent" to commit murder. Appellant's App. p. 142. A jury could have concluded that the original version of Preliminary Instruction 5a favored James because the instruction could be read as requiring the State to prove two separate elements of mental states. In addition, Preliminary Instruction 5b defined "intentionally" for the jury. *Id.* at 143.

[26] Furthermore, the trial court gave the jury a written revised instruction to correct any error. An Indiana statute forbids revision of jury instructions during trial, but only if the trial court issues the revision orally. *See* Ind. Code § 35-37-2-2 (1985) ("A charge of the court . . . may not be orally qualified, modified, or in any manner orally explained to the jury by the court."). The trial court has inherent authority to correct discretionary rulings, such as jury instruction matters, as long as a case is pending resolution. *See Fiandt v. State*, 996 N.E.2d 421, 424 (Ind. Ct. App. 2013) (trial court had discretion to correct erroneous grant of jury trial request while case was pending).

---

[3] The State argues that the original version of Preliminary Instruction 5a, as given to the jury, was not erroneous. It is unnecessary for us to address this point.

[27] Next, we presume that the jury follows the trial court's instructions. *Morgan v. State*, 903 N.E.2d 1010, 1019 (Ind. Ct. App. 2009), *trans. denied*. The trial court told the jurors to rip the prior version of Preliminary Instruction 5a out of their notebooks, give it to the bailiff, and replace it with the revised version to be distributed to them by the bailiff. After reading the revised instruction to the jury, the court said, "And again ladies and gentlemen, you should insert that where the one that was taken out and that will be taken back with you and considered along with the final instruction once those are given." Tr. p. 329. There is no evidence that the jury failed to comply with the court's directives.

[28] During closing argument, the State informed the jury that it was required to prove beyond a reasonable doubt that James specifically intended to kill Jaime. The prosecutor said that when James pointed the shotgun at Jaime, "That's the moment of intent. That was when he intended to kill her." *Id.* at 361.

[29] Finally, the evidence against James is extensive. The night before the shooting, James told Cart that he had a shotgun and would "blow her up." Tr. p. 189. Jaime testified in detail as to the surrounding facts and circumstances leading up to James shooting her. Officer Humphrey said that Jaime indicated that James shot her. The officers saw James wielding the shotgun at the scene of the shooting. Forensic scientists found James' fingerprint on the shotgun and determined that the shotgun had fired the shell that was found inside the house.

[30] Based on these considerations, James has failed to establish fundamental error in relation to Preliminary Instruction 5a. *See Perez v. State*, 872 N.E.2d 208, 212

(Ind. Ct. App. 2007) (any error from a jury instruction that included a reference to a "knowing" mens rea was not fundamental error in light of the other instructions), *trans. denied*.

# Conclusion

[31] For the reasons stated above, we affirm the judgement of the trial court.

[32] Affirmed.

Kirsch, J., and Bradford, J., concur.